Our press case this afternoon is 4-11-0-8-2-0. In re. Commitment of Curtner. Let's show for the appellant, William McGrath, you are he, sir? And for the appellee, Erica Sanger, you are she? Okay. Mr. McGrath, you may proceed. Thank you. Good afternoon, Your Honor. It's a pleasure to be here. Good morning. Good afternoon. Please support and counsel. My name is William McGrath, and I represent Mr. Curtner, who was the respondent in this case. Mr. Curtner was convicted in Illinois of committing two aggravated criminal sexual abuses. Can you keep your voice up, please? That's not a sound microphone. That's just a recording microphone. Mr. Curtner committed an aggravated criminal sexual abuse against a 14-year-old for improper sexual touching. He also committed an aggravated criminal sexual abuse against a 15-year-old for nonconsensual sexual activity. That was the evidence that was presented at the trial of his crimes that led to a civil sexually violent person's commitment case. At the trial, the State had presented most of their case. They had Dr. Bellows Smith, who testified, and they had Dr. Ed Smith, who testified. Dr. Smith was almost done when, and at that point the State concedes, there had been no evidence of the dangerousness of Mr. Curtner. There was no evidence that he had seriously harmed anyone, let alone a child, and none of that evidence was before the jury. The only context was that the Sexually Violent Person Commitment Act requires a showing that the respondent is dangerous because he suffers from a mental disorder that makes it substantially probable that he will engage in acts of sexual violence. It was at this point that Juror Ard made a comment to the bailiff that was related to the court. The record shows that there was a discussion held. Mr. Ard stated that he wanted to know whether Mr. Curtner was dangerous enough to kill one of the children, one of the kids. He further stated that he was wondering if he was capable of hurting or killing them or something like that. He stated that the word dangerous is what prompted him to think of this concern. After the verdict in this case, which I believe the jury was out approximately one hour, the judge informed counsel that there was a concern that the jurors had raised and the bailiff expressed the concern. Several of the jurors were concerned that the respondent, Mr. Curtner, might obtain their names and addresses and they wanted to know if his notes would be destroyed. They stated that they were concerned that after he got out, he would be coming to their addresses. They were concerned about their safety. Now, this fear, which was recognized by the trial court judge in ruling on the motion for a new trial, he stated that he personally, the judge personally, would not have shared the same fear that the jurors had. So he's acknowledging that they had a fear. Now, your honors, I believe this is a case of first impression in Illinois because we have two separate instances where a jury, a juror or several jurors, expressed a concern about their safety or expressed fear about the circumstances of the case and they wanted to know about or they felt they wanted to know about the dangerousness of this respondent. The court asked that the juror be admonished. On behalf of the respondent, I asked that the juror, Mr. R, be excused. The judge denied that. That was during the trial. Asked for an alternate to be seated. The court acknowledged that was a safe route but rejected it. After the jury verdict, there was a motion for a new trial in which this was presented to the court and it was denied also. I believe that courts in Illinois have tried to deal with the issue of juror bias. There's no real case on point that I was able to find. One that I did want to note, which is in my brief, is People v. Terry. It's an Illinois Supreme Court case where Justice Simon in dissent talked about the affiliation had to the jurors and their concern about the defendant in that case or a witness in that case being a member of a gang and how they were concerned about that, possibly the safety of the jurors after the trial, and he felt that that was sufficient for justifying a new trial. I think that's similar in this case in that we have a fear that's been expressed, a concern about the dangerousness of this respondent, not just to the children, which is what the jurors further down the road at the end of the trial toward their individual selves. Were they going to be bound after the trial and given some kind of a dangerous circumstance? In People v. Runge, another case that's been cited by both parties, that was a case where a juror did in fact state that he was worried about the, in that case it was a witness, knowing about their address and finding the jurors after the trial. That juror was excused. However, the facts of that case are different because that was a death penalty case and it was the death penalty phase and the juror stated specifically that he could not or he had already determined that the death penalty was appropriate, so the judge excused that juror. But that's at least a juror that had that issue of the names and addresses and he was excused. I don't think that's relevant. Well, let me ask this, counsel. It seems to me one of the problems you have in this case is this. You're looking at a panel on the appellate court, but cumulatively we have, I think, more than 35 years' experience as trial court judges. We've all been in a position of dealing with jurors and picking juries and issues that arise. I don't know if as a trial judge I would have handled this situation as Judge Glenn did. The problem is this. It seems to me this is one of those areas that has to be left to the sound discretion of the trial court. And for us to second-guess the trial court under these circumstances, whose after all he talked to the jurors, he saw them, he could pick up on body language and other things that we can't from a cold record. We have to conclude that no reasonable person in Judge Glenn's position could have made the call he did. How do we do that? Well, I'm certainly not going to contest that this is a tough issue for my position. I think that the combination, when Judge Glenn looked at juror Art, that's the number one time at which he exercised discretion. And in retrospect, just itself, that's probably a relatively safe thing for him to have done from the point of view of the appellate review. However, when you look at the issue that presented itself later in the trial, when you had jurors, multiple jurors, expressing significant concerns that did not arise from specific facts of the case, that did not arise from any of the evidence presented in the case, they were just a concern about a fear for the respondent. At that point, the judge could and I think should have revisited the issue of the prior juror's concerns and put in a package, made a decision that could in fact have impacted the discretion that he had. And I think it's a call that this court is probably not going to make, but that's our request, is to review it from the point of view of the secondary concerns that were raised by the jurors. And at that point in time, recognizing how significant the fear factor was to that jury. And I think that the facts of this case, if you look at the jury's evidence that was presented to the jury, there was nothing presented that presented this respondent as a monster or someone who had committed multiple acts against individuals that were considered violent crimes. Wasn't that the question the juror asked in the bailiff? How do we call this guy dangerous if nobody's testified to any of that? Well, that is what he asked. I don't recognize that question in the same light that the counsel for the state at the time, and I believe counsel on appeal are looking at that. I don't think it has to be read that this individual juror was waiting for the state to present evidence to prove that he had tried to hurt someone. I think it presents an outside-of-the-evidence concept on the part of the juror that presents themselves. The psychologists had testified as to dangerousness, and it sounds to me like the juror was asking the same question you're asking here, or making the same point you're making here. There's no evidence this guy's ever done anything physically violent to anybody. Well, that's one way to read that, Your Honor. I think that when he says, is this person dangerous enough to kill someone, that's not saying, I'd like to see the state present evidence to prove to me that he's dangerous enough. Is that what the juror said? Yes. Oh, well, he said, the counsel says, what was your question for the bailiff? And the juror says, well, it wasn't to see if he was dangerous, and I couldn't figure out why no one said anything, if he was capable of hurting someone or killing them or something like that. I don't see that that's... I mean, I think that's hard to know, but the juror did have that at a point in time when there wasn't a lot of discussion about dangerousness. The phrase was used in the context of the statute, but as the state has conceded, there So, for him to latch onto that indicates, in my mind, our argument is that... Again, it sounds to me like he's making the same argument you are. Why do we use the term dangerous when nobody's testified to any of that? I think we disagree on that. I'm not going to pretend that this is a case that has absolute bright lines to it. I think the combination of dangerousness and the juror's request to ask a question about whether or not this person is dangerous enough to injure or kill someone, a child, and the follow-up with jurors being concerned about the respondent's note-taking and whether he had addresses indicates a pervasive concern that wasn't addressed properly by the court. In regards to the other point we raised, the jury instruction, I understand that Illinois has adopted through several public courts a Wisconsin standard, which was used in this case. Defining substantially probable is much more likely than not. We don't agree with that. We think that the Illinois law should be different than Wisconsin because Illinois has a definition for substantially probable, and that appears in the knowledge language that's in the statute and in the jury instruction. That statute defines knowledge as both the substantial probability of an event occurring as well as the practical certainty that a result will follow. Would we have to agree with the First District's decision in Bailey in order to agree with your argument? Would we have to reject the First District in Bailey? Well, I think the First District in Bailey adopted the Wisconsin standard, so I think Illinois courts have done that. I would ask that the court... So I guess the answer to my question is yes? I would like you to adopt my standard. And reject Bailey? All right. I'll say that, Your Honor. Thank you. Yes, I think you should reject Bailey. Okay. And I think it's based on what I consider to be a much more appropriate standard, based on the nature of the statute. The statute is devised as an extraordinary remedy. We are civilly committing a person for many, many years. In my understanding of the statute, there are times when it's actually for life, and we're doing that based on what we perceive to be a propensity or a future act. And so the statute sets up... And it's a civil case that sets up due process rights under criminal law, and as a result, it should have a high standard, and that standard, as Illinois has determined by using this language of substantial probability, in other parts of its section, other parts of the statute, it should be read consistently. So instead of using a different state... And we don't know, and I don't have the site, but I don't know whether Wisconsin defines knowledge the same as Illinois, so I'm not sure that they had a reference point when they made that decision that was followed in Bailey. So I'd ask the court to find first that the jury was improperly influenced and that the court improperly sat Juror Art for the full trial after it was determined that he had requested information, and that after the jury verdict came in, the jury expressed concerns that go beyond the evidence and relate to their decision-making for reasons extraneous to the facts, and ask for a new trial. We also ask that the court adopt the standard for the jury instruction of substantial probability being much more practically certain, excuse me, and that that be, again, a reversal. The Bailey court is the only one exactly on point with regard to the second issue you raised. Is it not? Well, there's a... I just this morning saw a case that cited another case, and I can perhaps find that if the court... That's what case? It was a third district case, Truelock, decided June this year, and they cite in that, they cite the in-right detention of Hayes, and I believe the detention of Hayes also uses that Bailey's, or the Wisconsin standard. The Hayes case is the one from just a few weeks ago? No, the Truelock's citing Hayes. Hayes is the one from 2001. I believe that's a... This was a third district case, Truelock's. I believe that was either first district or third district. I didn't have the site list of which district it was, but I don't think there's any other case other than Bailey's. So the third district cases you mentioned follow Bailey? They follow Hayes, which follows Bailey, yes. What inference should we draw from the fact, if any, that Bailey was decided 12 years ago, holding that the term substantially probable meant much more likely than not, rather than practically certain, and the legislature in the intervening 12 years has apparently done nothing about it? Isn't that some suggestion that maybe the legislature is happy with this interpretation? That would be one interpretation, or one inference. I think that my overall inference is that there aren't too many legislators that are concerned about putting respondents in a better position in sexually violent person commitment cases. But that's a political statement. As far as the law goes, I think the implication is that after this many years, Illinois has developed that as a standard, but I believe it's still wrong. Okay. Thank you, counsel. Thank you. Ms. Seaborn? Good afternoon, Your Honors. Erica Seaborn from the Illinois Attorney General's Office here on behalf of the state. May it please the Court. Counsel. I'll begin with the issue about juror ARD. The question of whether or not to dismiss a juror is within the sound discretion of the trial court. And here, juror ARD, after being questioned by both the Court and by both counsel, repeatedly stated that he was going to be able to form an opinion, follow the judge's instructions, and that he could render a fair decision. Now, for a juror bias case, it's not enough to suspect that the juror has bias. You have to make a showing that the juror has some sort of fixed opinion. And here, juror ARD's opinion was not fixed. And we know that because he didn't walk into the courtroom and say, I have an opinion. He came into the courtroom and asked a question. And as the Court has pointed out, it's not even clear whether that question would tend to bias him in favor of respondent or in favor of the state. He asked this question in the middle of the state's expert testimony, and there was something that he wanted to know that he had not yet been told. Essentially, by asking whether the respondent was dangerous enough to kill someone, which is not a requirement for the SVP Act, he was sort of trying to add his own element. And the Court corrected him by instructing him that the Court would be doing all of the instructions on the law, and that juror ARD was not to form an opinion until after he had heard all the evidence. And juror ARD stated repeatedly that he would be able to do that. At best, this is an ambiguous indication of what juror ARD was thinking. And in this situation where juror ARD had been repeatedly questioned by both parties and had stated that he could be fair, it can't have been an abuse of the judge's discretion to refuse to dismiss him at that point. Now, related to juror ARD is the question of the jury's post-verdict questions to the bailiff about whether the respondent had their addresses. And respondent is sort of attempting to bolster one argument with the other. But juror ARD's question is not really relevant to the inquiry from the juror's post-verdict. Juror ARD, when he asked this question, never expressed that he himself had any fear of the respondent. And when the jurors asked about the addresses, there's no indication that juror ARD was one of those jurors. So the fact that these two things happened in the same trial don't really affect each other. As for the question of the post-verdict questions, again, it's not enough to say that there's a suspicion of bias. You have to show that the jurors had some sort of fixed opinion. In this case, you would have to show that the jurors' fear of the respondent led them to render a verdict that he was a sexually violent person when otherwise they would not have done so. And it's not clear from the jurors' questions that a fear of the respondent actually affected their verdict. In fact, it seems more likely, as the trial court found from dealing with this situation at the time, that it was the rendering of the verdict that then made them think that possibly they could have some fear of the respondent having their addresses. The reason that there is no information in the record about what exactly the jurors were thinking there is because nobody asked the jurors those questions. At the time when the court and the parties were having this discussion, the jurors were still in the courthouse. And we know that because the judge, after having this discussion, tells the bailiff, go tell the jurors that they shouldn't worry about this. If anyone really wanted to know what the jurors were thinking and whether a fear of the respondent caused them to render a verdict that he was an SVP when they wouldn't have otherwise, the jurors were right there for the asking. Even in the argument on the post-trial motion, no one suggested that the jurors be brought in and asked any of these questions or had any information indicating that the verdict was in any way affected. Finally, as to the jury instruction issue, the substantially probable definition has been affirmed by both the First District in Bailey and in the Hayes case, which I believe is from the Second District. Certainly it's not an abuse of the trial court's discretion to follow the precedent from the appellate districts. But we don't have to. Are they right? Are the Bailey and Hayes courts right? Yes, they are. Okay. How come? Tell me. Explain why. Well, the substantially probable definition, as the court pointed out, there is some indication that this is what the legislature's intended, or certainly that the legislature is satisfied with this definition because it has not changed this definition via statute, nor has our Supreme Court indicated that this definition is wrong. But on a more basic level, the Bailey court used this definition because it was following some Wisconsin precedent, which it found was relevant because the Wisconsin SVP statute is very similar to the Illinois SVP statute. In fact, I believe the Illinois SVP statute was in part modeled on the Wisconsin statute. So it was appropriate to follow that indication from Sister State, and that has been repeatedly affirmed by the other appellate districts in this state. Unless the court has any other questions, we would ask the court to affirm the judgment of the District Court. Thank you. Okay. Thank you, Counsel. Mr. McGrath. Anything further, sir? Nothing. Okay. Thank you. We'll take a stand. I have your advice on being recessed. Counsel Farmore.